1    WO

10            IN THE UNITED STATES DISTRICT COURT

11               FOR THE DISTRICT OF ARIZONA

13   Gordon C Reid,                    No. CV-15-00083-TUC-BPV

14            Petitioner,              **ORDER**

15   v.

16   Unknown Shartle,

17            Respondent.

20         Pending before the Court is Petitioner's Amended Petition under 28 U.S.C. § 2241

21   by a Person in Federal Custody (Doc. 7).  Respondent has filed a Return and Answer

22   (Docs. 26, 27), and Petitioner has filed a Reply (Doc. 34) and an Affidavit in support of

23   his Reply ("Petitioner's Aff.") (Doc. 35)[1].  In accordance with the provisions of 28

24   U.S.C. §636(c)(1), all parties consented to proceed before a United States Magistrate

25   Judge to conduct any and all further proceedings in this case, including trial and entry of

26   a final judgment, with direct review by the Ninth Circuit Court of Appeals if an appeal is

---

        [1] When citing Petitioner's Amended Petition (Doc. 7) and exhibits attached to
Petitioner's Affidavit (Doc. 35) the page numbers provided in this Order refer to the page
numbers assigned to the document by the Court's electronic filing system (CM/ECF).

filed. (Doc. 31). For the following reasons, Petitioner's Amended Petition is granted in part and denied in part.

## I.    Factual & Procedural Background

Petitioner Gordon C. Reid is an inmate currently incarcerated at the United States Penitentiary in Coleman, Florida ("USP Coleman"), in service of a 220-month sentence with three years of supervised release for violation of 18 U.S.C. § 1951(a), Interference with Commerce by Threats or Violence. (Answer at 1-2 (citing Answer, Exh. A)). Petitioner's projected release date is February 2, 2022, via good conduct time release. (*Id.*).

Since Petitioner was sentenced in February 2008, he has been designated to several BOP facilities throughout the country. (Answer at 2 & Exh. A, Atts. 2, 3). While incarcerated at the USP Tucson, Petitioner filed the instant action raising claims of due process violations, resulting in loss of good conduct time ("GCT"), in connection with ten disciplinary hearings at six institutions between 2008 and 2014. Specifically, Petitioner challenges:

1.    Loss of 27 days of GCT arising from a July 29, 2008 incident at USP McCreary (Ground One);

2.    Loss of 27 days of GCT arising from an August 4, 2008 incident at USP McCreary (Ground Two);

3.    Loss of 27 days GCT regarding an April 15, 2010 incident at USP Terre Haute (Ground Three);

4.    Loss of 27 days of GCT arising from an August 31, 2010 incident at USP Terre Haute (Ground Four);

5.    Loss of 27 days of GCT arising from a September 22, 2011 incident at USP Pollock (Ground Five);

6.    Loss of 27 days of GCT arising from a November 8, 2011[2] incident

---

[2] Although Petitioner's heading and supporting facts regarding Ground Six indicate the incident occurred on November 8, 2012, the record, including Petitioner's Reply, reflects that the correct date of the incident is November 8, 2011. (*See* Reply at

at USP Pollock (Ground Six);

7.  Loss of 54 days of GCT arising from a May 3, 2013 incident at USP Atwater (Ground 7) (involving two incident reports);

8.  Loss of 27 days of GCT arising from a January 10, 2013[3] incident at USP Atwater (Ground Eight); and

9.  Loss of 27 days of GCT arising from a June 8, 2014[4] incident at USP Tucson (Ground Nine).

Petitioner seeks to vacate all findings of the discipline hearing officers ("DHO") and to restore any and all good time credits. (Amended Petition at 9). Respondent argues that Petitioner failed to exhaust administrative remedies with regard to Grounds One through Eight and that Ground Nine is without merit. Respondent also, alternatively, argues that Grounds One through Eight are without merit as well.

## II. Jurisdiction

"Federal courts are always 'under an independent obligation to examine their own jurisdiction,'... and a federal court may not entertain an action over which it has no jurisdiction." *Hernandez v. Campbell*, 204 F.3d 861, 865 (9th Cir. 2000) (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990), *overruled in part on other grounds by City of Littleton, Colo. v. Z.J. Gifts D–4*, L.L.C., 541 U.S. 774 (2004)). With regard to habeas petitions, federal jurisdiction is dependent upon a proper characterization of the petition. *Gay v. Winn*, 2009 WL 275324, *2 (D. Ariz. Feb.5, 2009).

Because Petitioner challenges the manner or condition of the execution of his

---

14; Answer, Exh. A, Att. 13 at 1 (Incident Report)).

[3] Although Petitioner's heading to Ground Eight in his Amended Petition indicates the relevant date as September 22, 2011, the supporting facts reflect that the claim arises from a January 10, 2013 incident. (Amended Petition at 20; *see also* Reply at 20 (discussing January 10, 2013 incident)).

[4] Although Petitioner's heading to Ground Nine indicates the relevant year as 2013, the supporting facts and incident report reflect that the claim arises from a June 8, 2014 incident. (*See* Amended Petition at 22; Answer, Exh. A, Att. 19 at 4).

sentence, Petitioner's claim is properly filed pursuant to § 2241. *See e.g. Bostic v. Carlson,* 884 F.2d 1267, 1269 (9th Cir. 1989) ("Habeas corpus jurisdiction is available under 28 U.S.C. sec. 2241 for a prisoner's claims that he has been denied good time credits without due process of law."), *overruled on other grounds by Nettles v. Grounds,* 830 F.3d 922, 932 (9th Cir. 2016); *see also Nettles,* 830 F.3d 922 (discussing types of claims that fall within the core of federal habeas actions). Further, because Petitioner was incarcerated at the Federal penitentiary in Tucson, Arizona, when he filed this action, this Court retains jurisdiction to consider the Amended Petition despite Petitioner's subsequent transfer to FCC Coleman, Florida. *Francis v. Rison,* 894 F.2d 353 (9th Cir. 1990) ("jurisdiction attaches on the initial filing for habeas corpus relief, and it is not destroyed by a transfer of the petitioner and the accompanying custodial change.") (internal quotation marks and citation omitted).

## III. Exhaustion

Federal prisoners are generally required to exhaust available administrative remedies before filing a habeas corpus petition pursuant to 28 U.S.C. § 2241. *See Tucker v. Carlson*, 925 F.2d 330, 332 (9th Cir. 1991); *Martinez v. Roberts*, 804 F.2d 570, 571 (9th Cir. 1986). The failure to satisfy the exhaustion requirement applicable to section 2241 proceedings is not jurisdictional. *Brown v. Rison*, 895 F.2d 533, 535 (9th Cir. 1990), *overruled on other grounds by Reno v. Koray*, 515 U.S. 50, 54–55 (1995). Thus, where a federal prisoner fails to properly exhaust administrative remedies prior to filing a § 2241 petition, the district court has discretion to waive the exhaustion requirement and reach the merits, or require the petitioner to exhaust his administrative remedies before proceeding in court. *Id.*

The district court may exercise its discretion to waive the exhaustion requirement if the administrative remedy is inadequate, ineffective, or if attempting to exhaust would be futile or cause irreparable injury. *Fraley v. United States Bureau of Prisons*, 1 F.3d 924, 925 (9th Cir. 1993); *United Farm Workers of America v. Arizona Agr. Emp't. Relations Bd.,* 669 F.2d 1249, 1253 (9th Cir. 1983). Factors weighing in favor of

requiring exhaustion include whether: (1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct is own mistakes and to preclude the need for judicial review. *Noreiga–Lopez v. Ashcroft*, 335 F.3d 874, 880–81 (9th Cir. 2003) (citing *Montes v. Thornburgh*, 919 F.2d 531, 537 (9th Cir. 1990)). *See also Ruviwat v. Smith*, 701 F.2d 844, 845 (9th Cir. 1983) (recognizing that requiring exhaustion of administrative remedies "will aid judicial review by allowing the appropriate development of a factual record in an expert forum; conserve the court's time because of the possibility that the relief applied for may be granted at the administrative level; and allow the administrative agency an opportunity to correct errors occurring in the course of administrative proceedings.").

Accordingly, if the petitioner has not properly exhausted his claims, the district court may either "excuse the faulty exhaustion and reach the merits, or require the petitioner to exhaust his administrative remedies before proceeding in court[,]" *Brown*, 895 F.2d 535, unless such remedies are no longer available, in which instance the petitioner may have procedurally defaulted on his claims, *see Francis*, 894 F.2d at 354–55 & n. 2 (applying procedural default rules to administrative appeals). If a prisoner is unable to obtain an administrative remedy because of his failure to administratively appeal in a timely manner, then the petitioner has procedurally defaulted his habeas corpus claim. *See Nigro v. Sullivan,* 40 F.3d 990, 997 (9th Cir. 1994) (citing *Francis*, 894 F.2d at 354; *Martinez,* 804 F.2d at 571). If the claim is procedurally defaulted, the court may require the petitioner to demonstrate cause for the procedural default and actual prejudice from the alleged constitutional violation. *See Francis,* 894 F.2d at 355 (suggesting that the cause and prejudice test is the appropriate test); *Murray v. Carrier,* 477 U.S. 478, 492 (1986) (cause and prejudice test applied to procedural defaults on appeal); *Hughes v. Idaho State Bd. of Corrections,* 800 F.2d 905, 906-08 (9th Cir. 1986) (cause and prejudice test applied to pro se litigants).

The BOP has established an administrative remedy process permitting an inmate to seek review of an issue relating to "any aspect of his/her own confinement." 28 C.F.R. § 542.10(a). The BOP's Administrative Remedy program requires the prisoner to submit a formal written Administrative Remedy request within "20 calendar days following the date on which the basis for the Request occurred." 28 C.F.R. § 542.14(a)-(b). Where the prisoner seeks to appeal a DHO finding, the formal request is to be submitted directly to the appropriate regional office. 29 C.F.R. § 542.14(d)(2). "An inmate who is not satisfied with the Regional Director's response may submit an Appeal ... to the General Counsel within 30 calendar days of the date the Regional Director signed the response." 29 C.F.R. § 542.15(a). The time limits may be extended upon a showing of a valid reason for the delay. *Id*. "Appeal to the General Counsel is the final administrative appeal." *Id*.[5]

Respondent contends that Petitioner failed to exhaust administrative remedies as to each of the incidents reports challenged in Grounds One through Eight. In arguing that Petitioner did not exhaust administrative remedies, Respondent relies upon the declaration of Theresa T. Talplacido, a BOP employee with access to inmate disciplinary records, who states that administrative remedies were not exhausted for Grounds One through Eight. (*See* Answer, Exh. A at ¶¶6-7).

### A.    Grounds One and Two

Petitioner asserts in his verified Amended Petition that he was unable to exhaust Grounds One and Two because he did not receive a copy of the BP-10 (regional appeal) form with the DHO reports at issue and his subsequent attempts to obtain the forms from BOP officials were unsuccessful thus preventing him from pursuing administrative remedies. (Amended Petition at 11, 12; *see also* Petitioner's Aff. at ¶¶6-14). Thus, Petitioner does not dispute that administrative remedies were not pursued with regard to these grounds. Instead, he provides his affidavit statement that within a week of the DHO's decision in each case, he "began requesting BP-10 forms, which are required to

_____

[5] The regulations cited are the current version. If a prior version of the regulation applies, that version is discussed in regard to the particular claim to which it applies.

appeal DHO findings and sanctions with respect to these charges." (Petitioner's Aff. at ¶4). He was required to request the forms from his unit counselors, which he did until he was "transferr[ed] to FCI Butner SHU on October 15, 2008. . . ." (*Id.* at ¶6 ("I made requests for BP-10's in writing and in person to my counselor and other staff on a number of occasions, all to no avail."); *see also id.* at ¶5).

Once it became clear to Petitioner that the lack of response would cause his appeal to be untimely, he requested staff to verify on BOP stationary that he was not at fault for the untimely filing, but these requests were also ignored. (*Id.* at ¶¶7-9; *see also id.* at ¶7 (BOP policy requires such verification for an untimely filing)). Upon his transfer from USP McCreary to FCI Butner on October 15, 2008, he requested Butner staff to provide BP-10 forms and the necessary verification for the untimely filing. (*Id.* at ¶¶6, 10). Although he ultimately received one BP-10 form, staff informed him that "she would not verify that I was not at fault for missing my filing deadline with respect to [the incidents at issue] because she did not have any personal knowledge of the veracity of my assertions[]" and she advised he obtain the verification from McCreary. (*Id.* at ¶¶11, 12). Although Petitioner wrote his former counselor at McCreary to obtain the required verification "on at least two occasions", he never received a response. (*Id.* at ¶13).

It is not entirely clear that staff verification for the delay was absolutely required. The regulation in effect at the time indicated: "When the inmate demonstrates a valid reason for delay, these time limits may be extended. Valid reasons for delay include those situations described in § 542.14(b) of this part." 28 C.F.R. 542.15(a) (2008). In turn, section §542.14(b) specifically required verification only where "a response to the inmate's request for copies of *dispositions* requested under [28 C.F.R.] § 542.19 of this part was delayed." 28 C.F.R. § 542.14(b)[6] (2008) (emphasis added). Petitioner states he

---

[6] The applicable regulation in effect at the time provided:
In general, valid reason for delay means a situation which prevented the inmate from submitting the request within the established time frame. Valid reasons for delay include the following: an extended period in-transit during which the inmate was separated from documents needed to prepare the Request or Appeal; an extended period of time during which the inmate was physically incapable of preparing a Request or Appeal; an unusually

was delayed due to lack of response to his requests for a BP-10 form, not a disposition.

In any event, in context of the Prison Litigation Reform Act ("PLRA") which also requires exhaustion of prisoner claims, the District Court for the District of Arizona has observed that "[t]here is no obligation to exhaust a remedy that is not 'available.'" *Beckhum v. Hirsch,* 2010 WL 582095, *8 (D.Ariz. Feb. 17, 2010). "'If prison employees refuse to provide inmates with those [grievance] forms when requested, it is difficult to understand how the inmate has any available remedies.'" *Id.* (bracketed text in original) (quoting *Dale v. Lappin,* 376 F.3d 652, 656 (7th Cir. 2004) (administrative remedy not available where officials refuse to provide inmate with appropriate grievance forms when requested) and citing *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir. 2003); *Brown v. Croak,* 312 F.3d 109, 113 (3d Cir. 2002) (where officials thwarted the plaintiff's efforts to exhaust his remedies, the grievance procedure was not "available" with the meaning of §1997(e)(a)); *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir. 2001) (a remedy that prison officials prevent a prison from utilizing is not an available remedy under § 1997(e)(a)). That same logic applies here.

Petitioner has submitted evidence in the form of his verified Amended Petition and his affidavit statement that he requested the necessary forms for filing an appeal and that those requests went unheeded during the time within which the appeal was due.[7]

---

long period taken for informal resolution attempts; indication by an inmate, verified by staff, that a response to the inmate's request for copies of dispositions requested under § 542.19 of this part was delayed.

28 U.S.C. §542.14(b) (2008); *see also* 28 C.F.R. §§ 542.14(b), 542.15(a) (effective June 2010) (essentially the same language). However, denials of Petitioner's administrative remedy submissions in other instances support the conclusion that verification was required. (*See e.g.,* Answer, Exh. A, Att. 7 at 10 (June 25, 2012 denial of appeal, in part, because Petitioner did not "provide staff documentation on BOP letterhead you haven't received DHO report and delay not your fault); *id.* at 11 (September 20, 2012 denial of Central Office appeal indicating: "you must provide staff verification on letterhead to the region for your untimely filing"); *id.* at 15 (April 2013 denial of appeal of denial of grievance complaining about lack of access to administrative remedies at USP Pollock, directing Petitioner to "provide staff verification that you are not responsible for the untimely filing of this appeal."); *id.* (same with regard to a different appeal in April 2013)). Where Respondent's Exhibit A, Attachment 7 is quoted throughout this Order, all capitalization as used in Attachment 7 is omitted.

[7] Petitioner had 20 days to file an appeal. 28 C.F.R. § 542.15(b) (2008).

Although Respondent submits Ms. Talplacido's declaration that Petitioner did not pursue administrative remedies, Respondent has not addressed the issue of the availability of forms in 2008 at USP McCreary or FCI Butner, why Petitioner was refused the forms during the timeframe for filing an appeal, or how Petitioner could have exhausted administrative remedies without the necessary forms.

### B. Ground Three

Petitioner states in his verified Amended Petition that "the DHO Report was issued sans a BP-10 form, . . ." and his "attempts to secure the form and verification from prison officials proved fruitless resulting in forfeiture of his right to appeal." (Amended Petition at 13-14). However, in his affidavit filed with his Reply, Petitioner states that "upon reviewing my journal, which I did not have access to at the time of filing, I can unambiguously state that the [incident at issue in Ground Three] . . . is among those incidents wherein I did not receive a copy of the DHO report." (Petitioner's Aff. at ¶23). Petitioner goes on to state that he was unable to appeal the DHO's findings without access to the report. (*Id.* at ¶24). Because Petitioner provided a different reason in his Reply for failing to exhaust, Respondent did not have the opportunity to respond. However, Respondent's original contention that Petitioner failed to exhaust Ground Three still remains.

The incident at issue in Ground Three occurred in April 2010 at FCC Terre Haute, Indiana, the DHO hearing was held on June 4, 2010, and the DHO report was signed on October 25, 2010. (Answer, Exh. A, Att. 9 at 1-3). By the time the DHO report issued, Petitioner had already transferred to USP Pollock and the DHO report reflects that on October 25, 2010, it was sent to "USP Pollock . . . inmate copy to be delivered to inmate [/] Central File copy to Unit Team." (*Id.* at 3).

Petitioner submits a regional appeal dated October 22, 2010, indicating that he was appealing without a DHO report because his requests at USP Pollock (where he was housed at the time he filed the appeal) and USP Terre Haute (where the incident and DHO hearing occurred) went unanswered. (Petitioner's Aff., Exh. 7 (Doc. 35 at 37)). He

1  requested reversal of the findings, claiming self-defense and that the DHO should have
2  viewed the video. (*Id.*). The print out regarding administrative remedies submitted by
3  Respondent, (titled "Administrative Remedy Generalized Retrieval") does not reference
4  an appeal received in October or November 2010. (*See* Answer, Exh. A, Att. 7). The
5  form submitted by Petitioner bears no markings indicating it was received by the regional
6  office. (*See* Petitioner's Aff., Exh. 7 (Doc. 35 at 37)).

7        The regulations governing appeals were amended during the time period at issue.
8  Prior to June 18, 2010, which encompasses the date of the incident and the DHO hearing,
9  the pertinent regulation stated:

> At the time the . . . Discipline Hearing Officer gives an inmate written
> notice of its decision, the . . . DHO shall also advise the inmate that the
> inmate may appeal the decision under the Administrative Remedy
> Procedures (see part 542 of this chapter). . . . The inmate should forward a
> copy of the DHO report or, if not available at the time of filing, should state
> in his appeal the date of the DHO hearing and the nature of the charges
> against the inmate.

28 C.F.R. §542.19 (in effect prior to June 18, 2010). However, after June 18, 2010, when
Petitioner received the DHO report, the regulations no longer contained these specific
requirements for DHO appeals. *See* 28 C.F.R. § 542.14 (effective as of June 18, 2010).

      Upon a reading of the regulation in effect prior to June 18, 2010, it is reasonable
that an inmate would believe that the appeal period was not triggered until after the DHO
gave the inmate "written notice of its decision" and informed the inmate of his appeal
rights. By the time the DHO report issued some four months after the hearing, Petitioner
had been transferred to USP Pollock. While the DHO report indicates that it was
intended to be delivered to Petitioner at USP Pollock, there is no showing whatsoever
that it was delivered to him; to the contrary, Petitioner submits his affidavit statement
avowing that it was not. Nonetheless, the record reflects that Petitioner did not exhaust
his Ground Three claim.

**C.**    **Ground Four**

      Petitioner asserts in his verified Amended Petition that he could not appeal the
sanctions at issue in Ground Four because he never received a copy of the DHO report.

(Amended Petition at 15; *see also* Petitioner's Aff. at ¶30 (stating same)). Petitioner also asserts that his attempts to obtain the report were unavailing. (Amended Petition at 15).

The record reflects that the DHO hearing was held on October 11, 2010 and the report issued on October 12, 2010. (Answer, Exh. A, Att. 10 at 6-8). Although a box is checked indicating that a copy of the report was given to the inmate, the line in the report indicating the date and time the report was delivered to Petitioner is blank (*see id.* at 8), which supports Petitioner's statement that he did not receive it.

By October 2010, the regulations in effect did not have language requiring that the inmate submit a copy of the DHO report with his appeal. Petitioner had 20 days from the date that he was sanctioned to file an appeal. Respondent faults Petitioner with failing to "file[] an Administrative Remedy to allow BOP to promptly rectify the situation, rather than waiting years to file the Petition claiming not to have received them." (Answer at 27). However, Petitioner submits a regional appeal dated December 5, 2010 indicating that he had been unable to obtain a copy of the DHO report despite requests to counselor Nichols and the DHO. (Petitioner's Aff., Exh. 8 (Doc. 35 at 39)). He also challenged the lack of video review because the video would have shown that he did not attempt to assault anyone, and he challenged the DHO's refusal to grant his request to call unidentified witnesses who would have testified to his innocence. (*Id.*). He requested reversal of the DHO's findings. (*Id.*). The print out regarding administrative remedies submitted by Respondent does not reference an appeal received in December 2010. (*See* Answer, Exh. A, Att. 7 at 7). The form submitted by Petitioner bears no markings indicating it was received by the regional office. (*See* Petitioner's Aff., Exh. 8 (Doc. 35 at 39)).

Petitioner also filed an administrative grievance on March 18, 2013 complaining about lack of access to administrative remedies at USP Pollock. (Answer, Exh. A, Att. 7 at 14). The grievance was denied as untimely (*id.*) and his appeal was denied as follows: "provide staff verification that you are not responsible for the untimely filing of this appeal." (*Id.* at 15).

Together with his Answer, Respondent submits the Declaration of Nelson Ortiz, Unit Manager at FCC Coleman where Petitioner is currently imprisoned, stating that on September 4, 2015, Ortiz "personally handed" Petitioner a copy of the "incident reports" for the August 31, 2010 incident at issue in Ground Four. (Answer, Exh. B at ¶2; *see also* Answer, Exh. B, Att. 1 (attachments include the DHO report as well)). Respondent does not discuss the impact, if any, of having delivered the reports to Petitioner at this stage in the proceeding and Petitioner does not indicate in his Reply that he has begun to exhaust administrative remedies now that he has the DHO report.

**D**.    **Grounds Five and Six**

Petitioner asserts in his verified Amended Petition that he never received a copy of the DHO reports with regard to Grounds Five and Six and his attempts to obtain the reports were unsuccessful, which "cause[ed] Petitioner to forfeit his right to appeal." (Doc. 7 at 16, 17). Consistent with Petitioner's assertion, Respondent has been unable to locate a copy of the DHO reports. (*See* Answer, Exh. A at ¶9).

**1.    Ground Five**

With regard to Ground Five, Petitioner states in his Affidavit that the DHO told him he would have 20 days from the date the report issued to appeal. (Petitioner's Aff. at ¶47).

Ground Five involved a charge of assault involving another inmate on September 22, 2011. With his Affidavit, Petitioner submits a BP-10 form (regional appeal) dated June 5, 2012 indicating that in October 2011 at USP Pollock, he appeared for a DHO hearing for fighting with an inmate. (Petitioner's Aff., Exh. 1 (Doc. 35 at 20)). He objected to rejection of his request for video review, and to the DHO crossing out another inmate's name and writing down Petitioner's name instead as the person who assaulted the other inmate, whom he identified by name. (*Id.*). Petitioner also stated that he never received a copy of the DHO Report and "[w]hile I have been repeatedly informed by various staff that I would be receiving the DHO Report, it has not come to fruition. I request the findings be reversed, and the Incident Report expunged." (*Id.*). The

"Administrative Remedy Generalized Retrieval" print out, submitted by Respondent, indicates that an appeal of an "IR for fighting" was received on June 18, 2012. (Answer, Exh. A, Att. 7 at 10). The appeal was rejected under the following codes: DHO, MLT, UTR and OTH. (*Id.*). The rejection also stated: "which incident report are you appealing? You must provide staff documentation on BOP letterhead you haven't received DHO Report and delay not your fault." (*Id.*). Petitioner then filed a central office appeal, stating among other things, that he was unable to supply the requested information because he had not been provided with it. (Petitioner's Aff., Exh. 2 (Doc. 35 at 22)). Petitioner pointed out that he provided the name of the person he was charged with assaulting and the approximate date. (Id.). He also stressed that he could not mail the appeal within 20 days because he never received the DHO report and he "cannot provide staff documentation as staff Nichols, Smith, [illegible], Fotenot, and others ignore my request or are otherwise nonresponsive to my request for such documentation. As for which incident report, I'm appending, see attachment 1." (*Id.*). The Central Office rejected the appeal indicating: "UTR", "OTH", and "You must provide staff verification on letterhead to the region for your untimely filing." (Answer, Exh. A, Att. 7, 11). Petitioner contends that his "appeal was denied because the DHO report[8], which I was unable to obtain from prison officials was not appended to the BP-10." (Petitioner's Aff. at ¶86).

The record also reflects that a grievance was received at USP Atwater on March 18, 2013 when Petitioner was imprisoned at that prison. (Answer, Exh. A, Att. 7 at 13). The abstract indicates "to[o] many issues to list/from FCI Pollock[]". (*Id.*) The grievance was rejected because: "you should have filed in Sept[ember] when you first arrived[,] you list to[o] many issues on your BP-9, one per from [sic]. Compensation must be via a tort claim." (*Id.*).

---

8 Where "DHO" appeared as a reason for rejection on the printout submitted by Respondent, the request had been rejected, in part, because Petitioner did not provide a copy of the DHO report he wished to appeal, nor did he identify the charges and date of the DHO action. (*See* Petitioner's Aff., Exh. 3 (Doc. 35 at 26)).

Another grievance received at Atwater on March 18, 2013 raised the issue of "no access to admin remedies while at Pollock[.]"[9] (*Id.* at 14). The grievance was rejected as untimely: "you should have filled [sic] in September when you arrived at Atwater. You have had sufficient time to request forms from your unit team." (*Id.*). An appeal received at the regional level on April 1, 2013, regarding Petitioner's claim that he had "no access to admin remedies while at Pollock" was rejected with the direction that he should "provide staff verification that you are not responsible for the untimely filing of this appeal." (*Id.* at 15). The Central Office "concur[red] with region and institution's rationale for rejection." (*Id.* at 20)

### 2. Ground Six

On April 1, 2013, Petitioner submitted an administrative grievance (BP-9 form) at USP Atwater referencing a December 2011 incident report he received at FCI Pollock for fighting with another inmate. (Petitioner's Aff., Exh. 3 (Doc. 35 at 24)). He stated that he had yet to receive the DHO report despite "numerous 'Request[s] to Staff'", and that he was unable to obtain staff verification that he had not received the DHO report to excuse his untimely appeal. (*Id.*). He also stated that he had been informed by "staff that the time to appeal would be tolled from the time I received the DHO report, the time of receipt notwithstanding[]." (*Id.*). He stated that he made requests for administrative remedy forms. (*Id.*). "From Sept. 2012 to March 2013, I was similarly unable to obtain sufficient access to Ad. Remedy. Request my right to appeal to be reinstated, or compensation in the amount of $30K." (*Id.*).

The records submitted by Respondent also reflect a grievance received at USP Atwater on April 15, 2013, conveying Petitioner's complaints about not receiving DHO reports at FCI Pollock. (Answer, Exh. A, Att. 7 at 16). The grievance was rejected because: (1) Petitioner did not provide a copy of the DHO report he wished to appeal or identify the charges and date of DHO action; and (2) the request was untimely as it was

---

[9] This grievance arguably encompasses lack of access to administrative remedies regarding the incidents at issue in Ground Three and Four as well.

not received within 20 days of the event complained about. (Petitioner's Aff., Exh. 3 (Doc. 35 at 26)). Petitioner could resubmit his appeal in proper form within 10 days from the date of the rejection notice. (*Id.*). Petitioner was also informed that he "did not state any req[]uest in part A of the BP-9 Form. Be specific with your grievance." (Id.; *see also id.* at 25 (Amended Petitioner received the response on May 13, 2013); Answer, Exh. A., Att. 7 at 16)) Contrary to the response, the record reflects that Petitioner did state a specific request for relief in his grievance. (*See* Petitioner's Aff., Exh. 3 (Doc. 35 at 24) (requesting right to appeal be reinstated and $30,000)).

On April 29, 2013, Petitioner completed a regional appeal, essentially restating the claims raised in his original grievance, but this time he included the report number. (Petitioner's Aff, Exh. 4 (Doc. 35 at 28)). He also reasserted his request for his right to appeal to be reinstated or compensation in the amount of $30K." (*Id.*). The regional office rejected the appeal and directed Petitioner to "follow the instructions given to you at the institution." (*Id.* (Doc. 35 at 29); *see also* Answer, Exh. A, Att. 7 at 18). Petitioner raised the same claims before the Central Office, which issued a rejection stating that Petitioner filed his request or appeal to the wrong level: "You should have filed at the institution, regional office, or central office level." The Central Office went on to "concur with lower levels [sic] rationale for rejection. Follow directions provided on previous rejection notices. Submit appeal in proper form to institution." (Petitioner's Aff., Exh. 5 (Doc. 35 at 32); *see also* Answer, Exh. A, Att. 7 at 23).

### E.    Ground Seven

Petitioner asserts in his verified Amended Petition that the DHO informed him that he would have 20 days to appeal the decision from the date the DHO report issued. (Amended Petition at 19). The DHO hearing occurred on June 6, 2013 and involved two separate incidents. (*Id.*). Petitioner never received a copy of either DHO report. (*Id.* at 19-20).

While Respondent argues that Petitioner should have invoked the administrative remedy process to raise the issue that he never received the DHO reports, Respondent

also includes with his Response the Declaration of FCC Coleman Unit Manager Nelson Ortiz that the "incidents reports" related to Ground Seven were delivered to Petitioner on September 4, 2015, subsequent to the filing of the instant Amended Petition. (*See* Answer, Exh., B at ¶2; *see also id.,* Att. 2 and 3 (reports provided to Petitioner included the DHO reports, which were issued on July 29, 2013)). Respondent does not mention in his Answer that the reports have now been delivered to Petitioner or the impact, if any, of having delivered the reports to Petitioner at this stage in the proceeding.

Petitioner does not indicate in his Reply that he has begun to exhaust administrative remedies now that he has the reports. Petitioner does submit a regional appeal dated September 29, 2013, stating that he had not received a copy of the DHO report(s) despite repeated requests and that he was challenging the DHO's findings in light of the medical evidence. (Petitioner's Aff., Exh. 9 (Doc. 35 at 41)). He also objected to not being able to watch the alleged victim testify. (*Id.*). Petitioner requested that the DHO findings be reversed. (*Id.*). The appeal is not readily apparent on Respondent's Administrative Remedy Generalized Retrieval forms at Exhibit A, Attachment 7. The appeal form submitted to the Court by Petitioner does not reflect that it was received by the regional office. (*See* Petitioner's Aff., Exh. 9 (Doc. 35 at 41)).

### F. Ground Eight

On May 2, 2013, DHO Lorance at USP Atwater completed a DHO report for the incident at issue in Ground Eight. (Answer, Exh. A, Att. 16 at 20-23). On May 20, 2013, Petitioner appealed arguing that the report mistakenly reflected that B. Daniels was his staff representative, he was not given the name of the accusing officer who did not appear at the hearing, and full review of the video would support his claims of innocence. (Answer, Exh. A, Att. 17 at 1-2). On August 21, 2013, the regional director issued a memorandum to the Warden at USP Atwater directing the DHO to conduct a rehearing or, alternatively, to obtain Petitioner's signature waiving his right to staff representation, because the record indicated that Petitioner did not request a staff representative and B. Daniels who was indicated as the staff representative was prohibited from serving as staff

representative because he participated on the Unit Discipline Committee. (*See id.* at 3).

Petitioner was informed on August 20, 2013, in pertinent part:

> We are directing the DHO to conduct a rehearing in this matter.
> After receipt of the final report, should you wish to further appeal this action, you must first submit your appeal to the appropriate level (…regional office level for DHO actions). You should also include a copy of this response with your appeal to explain any delay in filing.
> This response is for informational purposes only.

("BP -10 Response") (Answer, Exh. A, Att. 17 at 4). Yet, the response goes on to state:

> If dissatisfied with this response, you may appeal to the Office of the General Counsel, … Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

(*Id.*).

Ultimately, the DHO amended the report on August 30, 2013 without a rehearing, and issued the same sanctions as the earlier finding. (Answer, Exh. A, Att. 16 at 1-5 (the amended report was delivered to Petitioner on September 9, 2013); *see also id.* at 5 (DHO indicating that the report was amended to reflect that B. Daniels did not review the video as a staff representative and "[t]he statement from Counselor Daniel [sic], concerning his review of the video surveillance film, was considered as evidence, not in the capacity of a staff representative but as part of the UDC.")).

Petitioner did not appeal the amended report at the regional level. (Answer at 23-24). Instead, on September 12, 2013, within the 30 day-deadline specified in the August 20, 2013 BP-10 Response, Petitioner filed a Central Office Administrative Remedy Appeal objecting to the rehearing because the DHO's summary of the evidence was insufficient to establish his guilt and the reason for the rehearing was not specified. (Answer, Exh. A, Att. 18 at 2). Over one year later, on April 17, 2015, Petitioner's appeal was denied because Petitioner was directed in the BP-10 response that an appeal to the amended DHO report must be submitted at the regional level and Petitioner "failed to submit [his] appeal of the rehearing in the appropriate manner and with the time frames required by policy." (*Id.* at 1).

Although the BP-10 Response included information about appealing any new hearing decision, the Response also clearly directed Petitioner to file an appeal to the General Counsel's office if he was dissatisfied with that Response. (Answer, Exh. A, Att. 17 at 4). The denial of Petitioner's appeal is at odds with this directive.

The record does support the conclusion that Petitioner did not appeal the DHO's amended report, which essentially consisted of the same findings as the prior report. Petitioner's Ground Eight does not specifically challenge the decision to allow amendment of the DHO report. Instead, Petitioner's challenge concerns procedural issues and sufficiency of the evidence. (*See* Amended Petition at 20-22; Reply at 30-31, 35, 37-38).

**G.    Conclusion**

The Court generally agrees with Respondent that Petitioner did not exhaust administrative remedies pertaining to Grounds One through Eight. Yet, the record also supports the conclusion that Petitioner did not ignore the exhaustion requirement; instead, he attempted, albeit at times imperfectly, to comply with the administrative remedy procedures despite in some instances being denied necessary forms, necessary staff verification for late filing, and copies of the DHO reports at issue.

The record also reflects that the events at issue occurred over a number of years and the oldest incidents date back to 2008. Although it is curious that Petitioner did not seek relief with regard to many of the claims long before now, there appears to be no statute of limitations applicable to § 2241 claims. *Cf. White v. Lambert,* 370 F.3d 1002, 1008 (noting that a §2241 action is not subject to the one-year statute of limitations provision of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2244(d)(a)), *overruled on other grounds by Hayward v. Marshall,* 603 F.3d 546 (2010), which was in turn overruled in part by *Swarthout v. Cooke,* __ U.S. __, 131 S.Ct. 859 (2011). In any event, because Respondent did not raise a statute of limitations defense, Petitioner's claims, no matter how dated, may proceed unless he is otherwise barred from pursuing them.

Respondent argues that Petitioner's failure to exhaust the claims raised in Grounds One through Eight results in immediate dismissal of those claims as "contrary to clearly established law." (Answer at 28 (citing *Porter v. Nussle,* 534 U.S. 516 (2002), *Booth v. Churner,* 532 U.S. 731; *Preiser v. Rodriguez,* 411 U.S. 475 1973; *Woodford v. Ngo,* 548 U.S. 81, 89-92 (2006)). The cases cited by Respondent, which involve civil rights actions subject to the statutory exhaustion requirements of the PLRA, 42 U.S.C. § 1997e(a), are inapposite. As discussed above, the administrative exhaustion requirement for § 2241 habeas proceedings is not jurisdictional. *See Brown,* 895 F.2d at 535. Thus, in this context, a prisoner's failure to exhaust administrative remedies does not deprive the Court of subject matter jurisdiction. *See e.g. Santiago-Lugo v. Warden,* 785 F.3d 467, 471-75 (11th Cir. 2015); *Bell v. Copenhaver,* 2013 WL 1680139, * (E.D. Cal. April 17, 2013) (exhaustion of § 2241 action "is not mandated by section 1997e(a)."); *Ward v. Chavez,* 2009 WL 2753024 (D. Ariz. Aug. 27, 2009) (because the duty to exhaust administrative remedies in the context of a §2241 petition is a judicially-created duty, the PLRA exhaustion requirement does not apply), *rev'd on other grounds by* 678 F.3d 1042 (9th Cir. 2012), *cf. Naddi v. Hill,* 106 F.3d 275 (9th Cir. 1997) (when determining the PLRA's *in forma pauperis* provisions did not apply to habeas cases, the court stated that Congress "did not intend to include habeas proceedings in the scope of the [PLRA], especially in light of the major revisions to habeas corpus law contained in the AEDPA, enacted just two days before the PLRA.").

In general, when a § 2241 petitioner fails to exhaust administrative remedies and it appears that there remain no available administrative remedies to exhaust, the petitioner's "failure is a procedural default." *Francis,* 894 F.2d at 355. The Respondent in *Francis,* like the Respondent here, "argued that review is barred by [the petitioner's] failure to exhaust available administrative remedies." *Id.* However, the Ninth Circuit recognized that failure to exhaust available administrative remedies, as raised by Respondent here, is "quite a different argument . . . from asserting procedural default[,]" and that the government's failure to argue procedural default "waive[s]" that defense. *Id.* ("Because

the government has never raised this procedural default as a bar to Francis' habeas claims, the default has been waived. . . .").  Where the government has waived procedural default, the district court should address the petitioner's claims on the merits if the petitioner cannot still exhaust administrative remedies or can demonstrate any extraordinary circumstances why he should not be required to exhaust available administrative remedies.  *Id.*  As in *Francis,* "[b]ecause the government has never raised … procedural default as a bar to [Petitioner's] claims, the default has been waived, and th[is] district court should reach the merits of [Petitioner's]  habeas claims[]" if Petitioner cannot still exhaust his administrative remedies or if he can demonstrate any extraordinary circumstances why exhaustion should not be required.  *Id.*

At this point, it appears that any further attempt to exhaust administrative remedies would be untimely.  Thus, it follows that no administrative remedies remain available to Petitioner.  The Court reaches this conclusion despite the Ninth Circuit's statement that "[d]ifficulties which a prisoner may experience in meeting the time requirements for an administrative appeal are properly first brought before the administrative agency." *Martinez,* 804 F.2d at 571 (citing 28 C.F.R. § 542.15 (1984)), given that the instant record supports the conclusion that the BOP has routinely required Petitioner to submit staff validation that any untimeliness was not his fault. *See supra* n. 6.  In some instances Petitioner has stated that staff at the institution where he located at a given time have declined to provide verification when the delay was allegedly caused at a different institution.   There is simply no basis on which to conclude that Petitioner, who is now imprisoned at FCC Coleman in Florida, can obtain staff validation for untimely appeals of DHO reports issuing from USP McCreary, USP Terre Haute, USP Pollock, and USP Atwater dating back to 2008.  Under the instant circumstances, the BOP requirement that staff validate that an untimely administrative appeal is not the fault of Petitioner, supports the conclusion that no further administrative remedies are viable for Petitioner and/or Petitioner's attempt to pursue administrative remedies at this point would be futile[10], and,

---

[10] Although the Ninth Circuit has recognized a futility exception to the exhaustion

1  therefore, no further administrative remedies remain available to Petitioner.  Nor does

2  Respondent suggest otherwise.  Because there are no administrative remedies available to

3  Petitioner at this point, the Court addresses Petitioner's claims on the merits.  *See*

4  *Francis*, 894 F.2d at 355 (where the government has waived a procedural default defense

5  and there remain no available remedies to exhaust, "the district court should reach the

6  merits of [the petitioner's] claims.").

7  **IV.  Merits Review**

8      **A.  Introduction: BOP Inmate Discipline Program**[11]

9      The BOP's inmate discipline program authorizes  BOP staff to impose sanctions

10  for certain prohibited acts which are divided into four categories of severity:  Low,

11  Moderate, High, and Greatest.  (*See* Answer at 3-4 (citing 28 C.F.R. §§541.1, 541.3 &

12  Tables 1-2)).  The discipline process ordinarily begins when a staff member issues an

13  inmate an Incident Report based on the staff member's observation or reasonable belief

14  that an inmate committed a prohibited act.  (*Id.* at 3 (citing 28 C.F.R. §541.5)).  A staff

15  investigation follows.  28 C.F.R. §541.5.

16      Upon completion of the staff investigation, the Unit Discipline Committee

17

18  requirement, *see Matias v. Oshiro,* 683 F.2d 318, 320-21 (9th Cir. 1982) (citing *Sweet v. Cupp,* 640 F.2d 233, 236 (9th Cir. 1981) ("petitioner need not exhaust state remedies which would clearly be futile"), it has also drawn back from that position in light of *Engle v. Isaac,* 456 U.S. 107 (1982) (involving 28 U.S.C. § 2254), at least with regard to statutory exhaustion requirements.  *See Noltie v. Peterson,* 9 F.3d 802, 805-06 (9th Cir. 1993). *Cf. Booth,* 532 U.S. at 741 ("we will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise.").  However, under § 2241, exhaustion is a prudential, rather than statutory, requirement. *Cf. Santiago-Lugo,* 785 F.3d at 474.  ("Congress said nothing at all in § 2241 about exhaustion, which is a judge-made requirement.").  Additionally, in §2241 habeas cases, district courts may waive the exhaustion requirement where pursuit would be futile.  Thus, in the event that futility does not in and of itself dispense with the exhaustion requirement, the Court, alternatively, excuses the exhaustion requirement, *see Brown,* 895 F.2d at 353, as futile for the same reasons as stated above.

[11] This section provides a general overview of the framework of the BOP's discipline program.  The regulations cited are the current regulations, which became effective in June 2011. *See* 76 Fed.Reg. 11078-01 (Mar. 1, 2011).  Because of the time span at issue in this case, prior versions of the regulations would have applied to some of Petitioner's claims.  Those prior versions appeared at 28 C.F.R. § 541.14, *et. seq.* for the years 2008 (the earliest of the incidents at issue here) through June 2011.  If application of a specific regulation is necessary to resolve any of Petitioner's particular claims, the Court will apply the appropriate version of the regulation.

("UDC") reviews the Incident Report. 28 C.F.R. §541.7. The inmate may appear before the UDC and is entitled to make a statement and present documentary evidence on his behalf. 28 C.F.R. §541.7(d), (e). The UDC may find that the inmate committed the prohibited act; it may find that he did not commit the prohibited act; or it may refer the matter to the DHO, depending on the seriousness of the prohibited act. 28 C.F.R. §541.7(a).

If the matter is referred to the DHO, the DHO, who must be impartial, will conduct a hearing. 28 C.F.R. §541.8. After the hearing, the DHO may find that the inmate committed the prohibited act charged or a similar prohibited act based on the Incident Report; the DHO may find that the inmate did not commit the prohibited act; or the DHO may refer the incident for further investigation, review, and disposition. 28 C.F.R. §541.8(a). "The DHO's decision must be based on at least some facts and if there is conflicting evidence, on the greater weight of the evidence." 28 C.F.R. §541.8(f).

The regulations require that the inmate receive a written copy of the DHO's report, which must document the following: (1) whether the inmate was advised of his rights; (2) the evidence relied upon; (3) the DHO's decision; (4) the sanction imposed; and (5) the reason for the sanction. 28 C.F.R. §541.8(h). The inmate may appeal the DHO's actions through the Administrative Remedy Program. 28 C.F.R. §541.8(i).

## B. Standard

To satisfy the basic requirements of due process in the context of prison discipline proceedings, prison officials need only provide an inmate with: (1) a written notice of the charge at least 24 hours prior to any hearing; (2) an opportunity to call witnesses and present documentary evidence in his defense when such action will not be unduly hazardous to institutional safety or correctional goals; (3) a written statement by the factfinders as to the evidence relied on and the reasons for the disciplinary action; (4) assistance at the hearing if the prisoner is illiterate or the case is unusually complex; and (5) an impartial fact finder. *Wolff v. McDonnell*, 418 U.S. 539, 565-66 (1974). Due process further requires only that disciplinary findings be supported by "some evidence"

in the record. *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454-55 (1985). This standard is met when "there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* at 455-56. The "some evidence standard" does not require the court to examine the entire disciplinary record, independently assess the credibility of witnesses, or reweigh the evidence. *Hill*, 472 U.S. at 455. Although this is a "minimally stringent" standard, "there must be some indicia of reliability of the information that forms the basis for prison disciplinary actions." *Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987).

In sum, "[t]he Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board." *Hill,* 472 U.S. at 457. Thus, even in cases where the evidence "might be characterized as meager," if "the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary[,]" those findings must be upheld. *Id.* Ordinarily, where the procedures outlined in *Wolff* are afforded to the Petitioner, and "some evidence" supports the hearing officer's decision, the requirements of due process are met. *Id.* at 455.

### C. Analysis

#### 1. Ground One

Petitioner challenges the loss of 27 days of GCT as a sanction for fighting at USP McCreary on July 29, 2008. (*See* Amended Petition at 10-11; Answer, Exh. A, Att. 6 at 1-3 (DHO report)). In reaching this decision, the DHO considered the Incident Report and Investigation in addition to memoranda from Officers Cornelius, Baker, Elderidge and Zantout, and injury assessment reports. (*Id.* at 41).

The DHO report reflects that Petitioner declined a staff representative and waived his right to call witnesses. (*Id.* at 1-2). Petitioner "admitted to being in a fight and offered no further statement concerning this incident." (*Id.* at 1).

Petitioner argues to the Court that he had "requested the presence of the aggressor who had assented to appear and admit that he had attacked Petitioner without consent,

cause, or provocation (all to the surprise of Petitioner), . . . ." (Amended Petition at 10). Petitioner also states that he had requested that the DHO personally review the video of the incident. (*Id.*). Petitioner asserts that the DHO informed him that "she was not going to either review the video or call Petitioner's witness because it would be for naught as [BOP]. . . policy makes no allowance for a prisoner defending himself." (*Id.* at 11; *see also* Reply at 5-6 (same)).[12]

According to Petitioner, the video would have shown that the other prisoner involved in the altercation (referred to as "H.") together with two other prisoners, "stalked" behind Petitioner for approximately one-eighth of a mile across the prison compound. (Petitioner's Aff. at ¶15(e)). When the men were "within striking distance" of Petitioner, he "no longer felt it prudent to continue with [his] back to these individuals, and turned to face them so as not to be waylaid." (*Id.* at ¶15(f)). When Petitioner turned to face the men, H. struck Petitioner in the face. (*Id.* at ¶(15(g)) Petitioner responded by taking H. to the ground and holding him there until prison staff responded. (*Id.*). Petitioner contends that the video would have shown that he used no more force than necessary to subdue his attacker. (Reply at 5).

Petitioner has a due process right to "present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff,* 418 U.S. at 566. Additionally, the right to call witnesses is subject to the "mutual accommodation between institutional needs and objectives and the provisions of the Constitution[.]" *Baxter v. Palmigiano,* 425 U.S. 308, 321 (1976) (citing *Wolff,* 418 U.S. at 556). Nonetheless, "[p]rison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other

---

[12] Petitioner clarifies in his Reply and accompanying affidavit that at the UDC hearing, he requested that the DHO review the video, and was informed by S. Partin that he "would have to select a staff representative. . . who would review the video and inform the DHO as to what s/he saw." (Petitioner's Aff. at ¶15(a)-(b)). Petitioner refused staff representation, objected to the procedure, and insisted that the DHO personally review the video. (*Id.* at ¶15(c)*; see also* Reply at 5)).

inmates to collect statements or to compile other documentary evidence." *Wolff*, 418 U.S. at 566. Prison officials may, but are not required to, explain their reasons limiting an inmate's efforts to defend himself. *Ponte v. Real*, 471 U.S. 491, 497 (1985). Where prison officials refuse to call a witness, they should explain their reasons in disciplinary proceedings or later in court proceedings. *Id.* Because "[p]rison officials may not arbitrarily deny an inmate's request to present witnesses or documentary evidence[,]" the burden is on prison officials to provide adequate justification for denial of such requests. *Bostic,* 884 F.2d at 1273 (citations omitted).

At the outset, Petitioner's assertion that he requested video evidence and that H. testify as a witness is not supported by the record. Instead, the record reflects that Petitioner "elected not to have a staff representative, and waived his right to call witnesses. He was advised of his right to present documentary evidence at the DHO hearing. He indicated he had no such evidence." (Answer, Exh. A, Att. 6 at 1; *see also id.* at 10 (Notice of Discipline Hearing before the DHO signed by Petitioner, indicating that he did not wish to have a staff representative and he did not wish to have witnesses)). Moreover, as to Petitioner's contention that he attempted to raise a claim of self-defense at the hearing, the DHO indicated that Petitioner "admitted to being in a fight and offered no further statement concerning this incident." (Answer, Exh. A. Att. 6 at 1).

On the instant record, there is simply no showing that Petitioner was denied the opportunity to call witnesses. With regard to the video, Petitioner admits he had the option of requesting a staff representative to view it and report to the DHO about its contents, but he declined that option. (Petitioner's Aff. at ¶15(b),(c)). Thus, any potential video evidence was omitted by the Petitioner's own choice and cannot be attributed to any due process violation on behalf of Respondent. Further, the District Court for the Eastern District of California has persuasively pointed out that:

> multiple cases have concluded that the hearing officer need not personally view the contents of a video in order to render a constitutionally valid finding of guilt. For example, in *Alexander v. Schleder*, 790 F.Supp.2d

1179, 1187 (E.D. Cal. 2011), the District Court considered a case in which the DHO declined to view videos, relying instead on reports of other officers that did in fact view the videos. *Alexander*, 790 F.Supp.2d at 1187.1 The Court held that "[t]he DHO did not need to personally review the videotape." (*Id.*) The Court supported its reasoning by comparing a DHO's right to rely on "statements of adverse witnesses without Petitioner's cross-examination or confrontation" with a DHO's right to "similarly rely on the statements of a staff member regarding his review of potentially exculpatory videotape evidence." (*Id.*) Concluding that due process does not require a DHO to personally watch a video of an incident, the Court held that a DHO can reasonably consider video evidence by relying on the written report of another officer that did view the video. A similar conclusion has been reached by multiple district courts since *Alexander*. *See, e.g., Greenburg v. Walsh*, 2015 WL 1508697 (D. Nev. March 31, 2015); *Oliver v. Babcock,* 2014 WL 29666 (E.D. Cal. Jan. 3, 2014); *Lopez v. Armstread,* 2015 WL 21941[8]3 (D. Nev. May 11, 2015); *Quick v. Drew*, 2012 WL 3000672 (D. South Carolina June 25, 2012).

*Foley v. Copenhaver,* 2016 WL 8731203, *4 (E.D. Cal. May 13, 2016) (footnote omitted) ("Put another way, if the "diminished" constitutional protections afforded to prison inmates include eliminating the Sixth Amendment confrontation right altogether, it is difficult to see how the introduction of a written summary of a tape's content, rather than the tape itself, could possibly violate an inmate's due process rights under *Hill*."), *adopted by* No. CV 14-853-DAD-JLT (E.D. Cal. Sept. 6, 2016).  The record supports the conclusion that Petitioner received the due process protections to which he was entitled with regard to the presentation of witnesses and documentary evidence in the form of the video, but he chose not to avail himself of those protections.

Further, to any extent that the DHO's failure to view the video denied Petitioner of due process, any such error was harmless. On a repeated and consistent basis, federal courts have held:

in prison disciplinary cases, "[e]ven if a prison official's actions create a potential due process violation, a habeas petitioner needs to demonstrate that he was harmed by the violation in order to obtain relief." *Jordan v. Zych,* No. 7:10–cv–491 (W.D.Va.2011) 2011 WL 2447937 at *4, citing *Brown v. Braxton*, 373 F.3d 501, 508 (4th Cir.2004). *See also Powell v. Coughlin*, 953 F.2d 744, 751 (2nd Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a

procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial"); *Piggie v. Cotton,* 344 F.3d 674, 678 (7th Cir.2003) (alleged due process violation rejected based on harmless error analysis, because prisoner failed to explain how excluded testimony would have aided his defense against disciplinary charges); *Pilgrim v. Luther*, 571 F.3d 201, 206 (2nd Cir.2009) ("a prisoner is entitled to assistance in 'marshaling evidence and presenting a defense,' " but "any violations of this qualified right are reviewed for 'harmless error' "); *Grossman v. Bruce,* 447 F.3d 801, 805 (10th Cir.2006) ("errors made by prison officials in denying witness testimony at official hearings are subject to harmless error review").

*Nielsen v. Graber,* 2012 WL 1520000, *5 (D. Ariz. March 16, 2012), *report and recommendation adopted*, 2012 WL 1530325 (D. Ariz. May 2012), (quoting *Adams v. Federal Bureau of Prisons,* 2011 WL 7293381, *3 (D. Minn., Dec. 6, 2011).

Here, Petitioner never denied involvement in the altercation. Instead Petitioner asserts that the video would have shown that he was followed by two other inmates prior to the altercation, that Petitioner turned to face H., H. threw the first punch and then "[Petitioner] took [H.] to the ground and restrained him. . . ." (Petitioner's Aff. at ¶15(g)). Thus, Petitioner's allegation as to what the video would show supports the conclusion that he engaged in fighting. Although the written accounts, which are discussed below, do not mention H. and others following Petitioner, the incident report is clear that, consistent with Petitioner's description to this Court, the two ultimately faced each other and H. threw the first punch. Likewise, the DHO found that H. threw the first punch. (Answer, Exh. A, Att. 6 at 2). Consequently, there does not appear to be any question, with or without the video, that H. was the initial aggressor. Nonetheless, based on Petitioner's own statement that the video would have shown him taking H. to the ground, it appears that the video would have essentially confirmed the written description of events reflected in the incident report and by the various eyewitness accounts, as well as to Petitioner's own admission to being involved in the altercation. Therefore, Petitioner has not shown that DHO's review of the video would have altered the outcome of the disciplinary proceeding. *See e.g. Foley,* 2016 WL 8731203, *4 (DHO's failure to view video in place of staff representative was not erroneous and even if it was, it would

have been harmless).

The DHO's decision also satisfied the appropriate evidentiary standard in finding Petitioner engaged in fighting. Consistent with Petitioner's version of events, the DHO found that inmate H. was the initial aggressor in that he pointed a finger at Petitioner and threw the first punch. (Answer, Exh. A, Att. 6 at 2). However, Petitioner then reacted by striking back at H. and the two "tackled each other and began wrestling on the ground." (*Id.*). Further, Petitioner admitted to the DHO that he had been involved in the altercation. (*Id.*). The DHO also relied on the injury assessments describing injuries consistent with the reporting officer's account of the incident. (*Id.*; *see also id.* 9 (Inmate Injury Assessment)). Although Petitioner contends that he did not strike H., (Petitioner's Aff. at ¶15(h)), the officer who wrote the Incident Report observed Petitioner and H having a

> heated exchange of words. . . Inmate H[] then pointed his finger at inmate Reid then threw a closed fist punch at inmate Reid striking him on the left cheek. Inmate Reid then threw a punch a H[] which missed. Both inmates tackled each other and began wrestling on the ground. I gave both inmates orders to stop fighting which neither complied.

(Answer, Exh. A, Att. 6 at 4). Another officer reported that he saw Petitioner and H. "posturing up in a boxing stance and both inmates grabbed each other and fell to the ground. . . ." (*Id.* at 6). A third officer observed the two in boxing stance, swinging punches at one another, and Petitioner "threw" H. to the ground. (*Id.* at 7). Petitioner then grabbed H. "by the hair and started pulling him as if to keep him on the ground." (*Id.*).

Petitioner's admission that he engaged in the altercation, alone and together with the officers' reports[13], constitute "some evidence" supporting the DHO's finding. The DHO could reasonably have concluded that Petitioner had the opportunity to block H.'s blows or to turn away from the altercation, and that by swinging at H. and wrestling him

---

[13] Petitioner asserts in this ground and others, as well as in his affidavit at paragraphs 77 and 78, that he was initially questioned within the hearing of other inmates, which chilled his ability to give a full account because he feared for his safety should he be perceived as reporting other inmates' misconduct. However, nothing in the record demonstrates that Petitioner was not able to give a full account of his version during the hearing.

to the ground, Petitioner was engaged in fighting. Further nothing in the applicable "regulations indicates that a prisoner is *not* guilty of fighting if the other inmate throws the first punch and the prisoner merely responds in kind." *Foley,* 2016 WL 8731203, *4 (emphasis in original). Because Petitioner's claim that he was deprived of due process in Ground One is without merit, Ground One is denied.

### 2. Ground Two

Petitioner challenges the loss of 27 days of GCT as a sanction for fighting with his cellmate on August 4, 2008 at USP McCreary. (Amended Petition at 11-12). The incident report reflects that Officer S. Cerrato heard a commotion in Petitioner's cell and upon further investigation observed Petitioner and his cellmate on "the cell floor, both had a hold of one another grappling around as well as both inmates trying to punch at each other." (Answer, Exh. A, Att. 8 at 5[14]).

Petitioner argues that he was deprived of due process because the DHO refused to call his requested witnesses (consisting of "the SHU Lieutenant and IDO", and his cellmate) to support Petitioner's claim of self-defense. (Amended Petition at 12). According to Petitioner, the DHO declined to call the requested witnesses stating that "even if proved, self-defense does not operate to excuse fighting under Bureau policy." (*Id.*).

According to Petitioner, the staff would have testified that he had attempted to change cellmates because he and his cellmate did not get along and Petitioner "felt an assault on my person was imminent." (Petitioner's Aff. ¶16(a)). His cellmate would have testified that he, without warning, physically attacked Petitioner. (Amended Petition at 12).

As discussed earlier, when prison officials refuse to call a witness, they should explain their reasons in disciplinary proceedings or later in court proceedings, as they

---

[14] Although the exhibits pertaining to this ground were filed under seal because they contained personal information relating to Petitioner and/or other inmates (*see* Docs. 23, 25), Respondent has cited to and quoted from the sealed exhibits in his Answer. Like Respondent's Answer, the references in this Order do not disclose more than what is already in the public record via the parties' public filings.

have the burden of establishing adequate justification for their refusal to allow the witness. *Ponte,* 471 U.S. at 496; *Bostic*, 884 F.2d at 1274. However, nowhere in the record is there any indication that Petitioner requested that his cellmate be called as a witness. Because Petitioner has failed to establish that he requested his cellmate as a witness, he cannot show that the request was arbitrarily denied.

Prior to the hearing, Petitioner did indicate that that he wished to call "SHU #1 [illegible] Maley" and Duty Officer Andrews both of whom Petitioner expected to testify that Petitioner had "[t]ried to get out of cell." (Answer, Exh. A, Att. 8 at 8). The DHO report form has a boxes checked indicating that Petitioner did *and* did not request witnesses and the DHO's summary reflects that Petitioner "waived his right to call witnesses." (Answer, Exh. A, Att. 8 at 2).

The record reflects that prior to the hearing, the DHO e-mailed Duty Officer Andrews indicating that Petitioner had requested Andrews as a witness, claiming that "you could verify that he was not getting along with his cell mate last weekend and was asking to be moved. If you could just reply to this E-Mail that would be sufficient." (Answer, Exh. A, Att. 8 at 9). Officer Andrews responded that Petitioner "did in fact ask me to give him a cell change. I passed it on as the Duty Officer to the number one in charge." (*Id.*). The DHO report correctly reflects Officer Andrews' statement. (Answer, Exh. A, Att. 8 at 2). The DHO also noted in his report that Officer Maley, whom Petitioner wanted to confirm that he had requested a cell change, could not be reached. (*Id.*). The DHO did not pursue Officer Maley's testimony because the fact Petitioner wanted a cell change had already been verified by Officer Andrews, and Petitioner's cellmate testified at his own hearing that Petitioner "wanted out of that cell."[15] (*Id.*). In concluding that Petitioner committed the prohibited act of fighting, a violation of Code

---

[15] At the DHO hearing, Petitioner stated to the DHO that "he ha[d] been trying to get out of that cell because he was not getting along with his [cellmate]. On August 4, 2008, when he was picking up his food tray [his cellmate] hit him and he was only trying to defend himself." (Answer, Exh. A, Att. 8 at 2).

201, the DHO relied on: (1) "the reporting staff members written report describing [Petitioner and his cellmate] … grappling and attempting to punch each other[]"; (2) Petitioner's admission to being involved in the altercation; and (3) the injury assessments describing Petitioner's and his cellmate's injuries which were "consistent with the reporting officer's account of the incident." (*Id.* at 3; *see also id.* at 2 (both inmates suffered various abrasions about the face and head and Petitioner's cellmate also suffered an abrasion to the left chest; *id.* at 10-11 (injury assessments)).

"[P]rison disciplinary committees may sometimes deny a defendant the right to call redundant and unnecessary witnesses[.]" *Bostic,* 884 F.2d at 1273 (citation omitted). However, the inmate may not be denied "the right to call important witnesses solely for the sake of administrative efficiency." (*Id.*). Petitioner has not shown that Officers Andrews and Maley would have provided testimony that was "crucial to [his] defense" and "not repetitive." *See id.* at 1274 (DHO's decision not to call a requested witness did not violate due process where petitioner failed to make such a showing). Nor does it appear on the instant record that live testimony was crucial to Petitioner's case. Officer Andrews' e-mail reply and even Petitioner's cellmate's testimony at his own hearing confirmed Petitioner's statements that he had requested to change cells. Nor did the DHO appear to doubt that Petitioner was not getting along with his cellmate. (*See* Answer, Exh. A, Att. 8 at 9 (DHO's e-mail inquiry to Mr. Andrews)). That the cellmate may have been the aggressor, does not undermine the DHO's finding of "some evidence" that, no matter who threw the first punch, Petitioner engaged in fighting as observed by staff and as admitted to by Petitioner. *See e.g. Foley,* 2016 WL 8731203, *4 (nothing in the regulations prohibiting fighting "indicates that a prisoner is *not* guilty of fighting if the other inmate throws the first punch and the prisoner merely responds in kind.") (emphasis in original). Accordingly, for the foregoing reasons, Petitioner's Ground Two is denied as without merit.

### 3.    Ground Three

Petitioner challenges the loss of 27 days of GCT as a sanction for fighting with

another inmate on April 15, 2010 at USP Terre Haute. (Amended Petition at 13-14; Answer, Exh. A, Att. 9 at 1-3). Petitioner challenges the DHO's refusal to personally review video evidence of the incident because, according to Petitioner, the video would show that he was merely acting in self-defense when the other inmate attacked him with a cane. Petitioner also argues that the various accounts of the incident provided by prison staff are in conflict and, thus, have no evidentiary value.

Petitioner asserts that when he requested that the DHO review the video, he was informed that "I must request a staff rep who would then review the CCTV video and inform the DHO of his/her interpretation of what s/he saw." (Petitioner's Aff. ¶20). Petitioner declined to request a staff representative, but when he requested the DHO to review the video, a staff representative was appointed over his objection. (*Id.* at ¶¶21-22). As discussed above with regard to Ground One, there is no support for the conclusion that it is an automatic violation of due process when the DHO declines to personally view a video and instead relies on the report of another staff member who did review the video.

The incident report authored by Officer Iseman reflects that he observed Petitioner and another inmate "swinging grey plastic chairs at each other. I began to approach them when they started to hit each other in the face and body with closed fists. . . . Once I reached the inmates that were fighting, they were on the ground punching each other repeatedly." (Answer, Exh. A, Att. 9 at 4). When Officers Bates and Harlow responded to a call for assistance, they saw Petitioner and the other inmate on the floor fighting and struggling. (*Id.* 33 (Bates refers to the altercation as a "fight"); *Id.* at 34 (Harlow describes the men "on the floor struggling")). The video review, as summarized by Lt. Peters, reflected that the other inmate first attacked Petitioner with a cane and Petitioner "blocked the cane with a chair and both inmates went to the floor with Reid on top. Inmate Reid then began punching [the other inmate] numerous times to his head." (*Id.* at 14). The other inmate was taken to the hospital "[d]ue to the fact that. . .[he] lost consciousness and [suffered a] laceration to the left pupil . . . ." (*Id.* at 15). "A small

home made ice pick type weapon was found in the immediate area after the fight. Each inmate stated the other had a weapon and was able to 'wrestle it away from the other.'" (*Id.*). The photographic evidence included photos of a cane and the ice pick. (*Id.* 48-49).

In his report, the DHO relied on Officer Iseman's report, including that Iseman observed the men swinging plastic chairs at one another. (*Id.* at 2). The DHO also recounted Lt. Peters' summary of the video showing that the other inmate "first struck [Petitioner] with a cane. [Petitioner] attempted to block the strike with a chair and then both inmates fell to the floor with [Petitioner] on top punching . . ." the other inmate. (*Id.*).[16] The DHO noted the staff representative's statement "that the incident report accurately portrays what he saw on the video. He also stated that [Petitioner's] life did not appear to be in jeopardy." (*Id.*). The DHO also cited clinic notes indicating Petitioner suffered swelling, bruising, and minor abrasions and the other inmate suffered laceration to the forehead, bleeding from the left eye and possible concussion. (*Id.*). The DHO also considered Petitioner's statement that: "I was going to my cell and he hit me with a cane. I used the chair to block it. Then we got into a tussling match and I put him in [sic] head lock to subdue him." (*Id.*) The DHO wrote that although Petitioner claimed "he was defending himself, according to the review of the tape by the staff representative he states the report is truthful as written. Although [the other inmate] does try to strike [Petitioner] with a cane, he blocks that strike with a chair and then according to the evidence [Petitioner] sits on top of [the other inmate] and proceeds to punch him numerous times in the head and face, to the extent that he is taken to the outside hospital due to his injuries. The DHO does not believe his actions were merely defensive in nature." (*Id.*). "Based upon the greater weight of the evidence, the DHO. . ." found that Petitioner had committed the prohibited act of fighting with another person. (*Id.* (citing Code 201)).

---

[16] The DHO noted in his report that "[t]he video review did not provide any additional evidence of who had the weapon as it could not be seen. Additionally, neither inmate had obvious injuries which appeared to be caused by this weapon." (Answer, Exh. A, Att. 9 at 2).

Petitioner argues that Officer Iseman's account that both inmates were swinging chairs at each other is inconsistent with video evidence and Petitioner's testimony, that the other inmate was wielding a cane, not a chair. (*See* Reply at 8). Petitioner also points out that one version has him fighting on the floor while another has him sitting on top of the other inmate punching him. (*Id.*). Although the DHO did not specifically note that Officer Iseman's report placed a chair instead of a cane in the other inmate's hand, any discrepancy does not alter the allegation that the men were fighting, especially in light of Petitioner's admitted involvement in the altercation. Finally, a report that Petitioner was punching the other inmate while sitting on him on the floor is not necessarily inconsistent with another report that the two were on the floor struggling; the latter version is less specific.

In conclusion, Petitioner has not demonstrated a due process violation because the DHO did not personally view the video. Petitioner does not argue that the description of the video is inconsistent with his theory of the case—that the other inmate swung a cane at him and the altercation ensued. There is absolutely no basis on which to conclude that had the DHO viewed the video, the outcome of the disciplinary proceeding would have been different. Additionally, the record demonstrates "some evidence" in the form of video, eye witness accounts, and medical evidence which supports the DHO's finding. Petitioner's Ground Three is denied as without merit.

### 4. Ground Four

Petitioner challenges the loss of 27 days of GCT as a sanction for Attempting or Planning Assault without Serious Injury, Code 224A, and Refusing to Obey an Order of Any Staff Member, Code 307[17] on August 31, 2010 at USP Terre Haute. (*See* Amended Petition at 14-15; Answer, Exh. A, Att. 10 at 6-8). Although the incident occurred while

_____

[17] In his Amended Petition, Petitioner states he was charged with "assaulting the 'use of force' team . . . ." (Amended Petition at 14). The Incident Report is clear that Petitioner was charged with: Refusing an Order, Engaging in a Group Demonstration; and Attempted Assault on Staff. (Answer, Exh. A, Att. 10 at 1). Petitioner clarifies in his Reply that the charge of engaging in group demonstration is not at issue here. (Reply at 9).

- 34 -

Petitioner was incarcerated at USP Terre Haute, Indiana, the DHO hearing occurred at USP Pollock, Louisiana, upon Petitioner's transfer to that location. (Amended Petition at 14).

While still incarcerated in Indiana, Petitioner requested videos of the incident, but when he was informed "that the only way the videos would be reviewed is if I ceded to staff representation. I declined." (Petitioner's Aff. at ¶27; *see also* Answer, Exh. A, Att. 10 at 5 (form indicating Petitioner did not request a staff representative); *Id.* at 9 (September 10 and 11, 2010 e-mails between prison staff attempting to locate videos); *Id.* at 10 (September 22, 2010 e-mail noting that Petitioner did not elect to have a staff representative, "but in this case, he has no choice, if he wants the video evidence[]" and that Petitioner was so informed "but he refused a staff rep 3 times. We told him this would be the outcome.")). By September 29, 2010, it was determined that "the video" Petitioner wanted "is no longer available." (*Id.* at 11).

Petitioner asserts that when he presented for hearing on October 11, 2010, at USP Pollock in Louisiana, he requested the videos and informed the DHO that the videos "would conclusively show that I did not assault any one, let alone a member of the staff." (Petitioner's Aff. at ¶29). According to Petitioner, the DHO told him that she was not going to continue the hearing to obtain the videos. (*Id.* at ¶30).

While it is troubling that the videos were not preserved, the record is clear that the Petitioner's own actions resulted in that evidence not being considered. As in Ground One, Petitioner chose not to request a staff representative despite knowing that the video would be considered only if he had a staff representative. Moreover, as Respondent points out, any due process violation resulting from failure to preserve the videos is harmless given that Petitioner claims the videos would show he had not assaulted anyone. Petitioner was not found to have committed assault; instead, the charge, and finding, was of attempted assault.

With regard to Petitioner's claim that he was denied his requested witnesses, that claim was not raised in his Petition. Petitioner cannot properly assert additional claims

for relief in his Reply. *See Cacoperdo v.. Demost*, 37 F.3d 504, 507 (9th Cir. 1994) (district court need not consider habeas claim raised for the first time in traverse); *United States v. Anekwu*, 695 F.3d 967, 985 (9th Cir. 2012) (new issues raised for the first time in a reply brief are waived); *United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005) (same). Even if Petitioner's claim was properly before the Court, he has not argued to this Court how the witness testimony would have changed the outcome. Thus any potential due process violation was harmless.

As to the DHO's findings, the DHO relied on the incident report which reflected that Petitioner became disruptive by refusing to submit to restraints so that staff could remove him from the recreation cage. (Answer, Exh. A, Att. 10 at 7; *see also id.* at 1). "As staff approached the cage, [Petitioner] proceeded to move to the back of the cage, yelling at staff to get the Use-of-Force team." (*Id.* at 7). "As the team attempted to place him in his cell, inmate Reid attempted to assault staff by pushing towards staff as they were exiting the cell." (*Id.*). Petitioner told the DHO he was "'not guilty'." (*Id.* at 6). In finding against Petitioner, the DHO placed greater weight on the incident report. (*Id.* at 7).

The "some evidence standard" does not require the Court to independently assess witness credibility or reweigh the evidence. *See Hill,* 472 U.S. at 455. The standard is met where, as here, there is some evidence in the record consisting of the officer's account in the incident report that supports the DHO's findings. Accordingly, Petitioner's Ground Four is denied as without merit.

### 5. Ground Five

Petitioner challenges the loss of 27 days of GCT as a sanction for assaulting another inmate on September 22, 2011 at USP Pollock. (Amended Petition at 15-16). Petitioner asserts that he did not receive a copy of the DHO report. (*Id.* at 16). Respondent has been unable to locate a copy of the report.[18] (*See* Answer, Exh. A at ¶9).

---

[18] It is troubling that Petitioner maintains that he did not receive a copy of the DHO report, and no decision has been located. *Wolff* recognized that due process requires that the prisoner receive a written statement by the fact-finder of the evidence

Respondent submits the underlying incident reports and memoranda. (*See* Answer, Exh. A, Atts. 11, 12). Petitioner stresses, among other things, that his requested witnesses who were not called would have corroborated his defense and the video, as summarized by one of the officers, did not show that Petitioner struck the other inmate. A spread sheet captioned: "Incident Report History" submitted by Respondent indicates that Petitioner told the DHO that he "was trying to break up the fight." (Answer, Exh. A, Att. 12 at 6) (all capitalization omitted). According to Petitioner, he recounted to the DHO how he was trying to break up a fight among the other inmates involved and that "[a]t no time did I ever strike [the victim]." (Petitioner's Aff. at ¶¶37, 38).

While it is likely that the reports and other records submitted by Respondent were before the DHO at the time of the hearing, the record before this Court does not reflect what evidence the DHO considered other than Petitioner's statement, which essentially denied the charge. (*See* Answer, Exh. A, Att. 12 at 6). Without the DHO's report, it is not possible for the Court to discern whether the DHO's decision to impose sanctions constituted a deprivation of Petitioner's due process rights. Accordingly, Petitioner's Amended Petition is granted with regard to Ground Five.

### 6. Ground Six

Petitioner contests the loss of 27 days of GCT as a sanction for fighting with another inmate on November 8, 2011 at USP Pollock. (Amended Petition at 16-17; Reply at 14-16 (reflecting incident occurred in November 2011 not 2012 as indicated in the Amended Petition; *see also* Answer, Exh. A, Att. 13 at 1 (same)). Petitioner claims his right to procedural due process was denied as a result of the denial of his requests for the other inmate involved in the altercation to be called as a witness and that the DHO review the video of the incident. (*Id.* at 16). Petitioner asserts that he never received a copy of the DHO report. (*Id.* at 17). Respondent has been unable to locate a copy of the

---

relied on and the reasons for the disciplinary action. Petitioner has not argued that the BOP's failure to provide him with a copy of the DHO report violated his due process rights.

DHO report.  (Answer, Exh. A at ¶9).[19]

The Incident Report written by Lieutenant Crittle reflects that he responded to the recreation cage upon hearing arguing.  (Answer, Exh. A, Att. 13 at 1).  When Lt. Crittle arrived, he saw Petitioner "laying on his back as inmate . . . B[] . . . was standing over him.  I observed inmate B[] and Reid exchange words as inmate Reid came to his feet.  The two inmates then faced each other in a confrontational posture and continued to exchange words." (*Id.*).  Despite Lt. Crittle's order to cease, they did not comply.  (*Id.*).  "Inmates Reid and B[] then began striking each other about the face and upper torso with closed fists."  (*Id.*).  Both inmates refused to comply with Lt. Crittle's orders to stop fighting.  (*Id.*).  "As inmate B[] was knocked to the ground near the sallyport door I gave him a direct order to step inside the sallyport.  Inmate B[] refused my orders and engaged in the altercation again.  I again ordered the inmates to stop fighting and they did not comply."  (*Id.*).  The inmates continued to disregard Lt. Crittle's orders to cease fighting and oleoresin capsicum was used to accomplish compliance.  (*Id.*).  Memoranda from other officers who responded after Lt. Crittle, indicated that Petitioner and inmate B. continued fighting despite Lt. Crittle's orders to stop.  (*See* Answer, Exh. A., Att. 13 at 10 (Officer Ellcey), 11 (Officer Poirier), 12 (Officer Miller)).  There is no indication in the record that the DHO was informed about the video's contents.

Petitioner asserts that he was acting in self-defense and that the video would have shown that prior to Lt. Crittle's arrival, inmate B. had "waylaid Petitioner by 'sucker punching' him and knocking him to the ground."  (Reply at 14; *see also id.* at 16).  Petitioner claims he continued fighting after Lt. Crittle's orders to stop because he

---

[19] Although Petitioner asserts that he did not receive a copy of the DHO report (Amended Petition at 17), and no report is in the record, he does state that the DHO "omitted in the DHO Report" the DHO's statement at the hearing that Petitioner's requested evidence would not help Petitioner "because self-defense is no defense to fighting in the BOP."  (Reply at 16).  However, Petitioner could be referring to an "Incident Report History" spread sheet submitted in support of Respondent's Answer at Exh. A, Att. 12, page 7.  Petitioner has not alleged that his due process rights were violated because he did not receive a copy of the DHO report.  Further, as discussed below, in light of Petitioner's statements in the record, any violation resulting from BOP's failure to provide Petitioner with the report was harmless.

suspected inmate B. had a weapon and B. persisted his assault on Petitioner. (*See* Reply at 14-15). Petitioner also asserts that B. would have testified that he had attacked Petitioner without provocation. (Petitioner's Aff. at ¶45). According to Petitioner, the DHO refused his request for the witness and video evidence because even if the evidence confirmed Petitioner's "version of the event, it would be for naught because a prisoner is not allowed to defend himself in the BOP, and despite the fact that the prisoner was apparently armed and dangerous." (*Id.* at ¶46). Respondent's "Incident Report History" form reflects that Petitioner stated to the DHO: "'No, I[]didn't hit him.'" (Answer, Exh. A, Att. 12 at 7) (all capitalization omitted). Additionally, Petitioner's statements in his briefing confirm that he raised self-defense before the DHO.

The reason given by the DHO for declining to consider the video and inmate B.'s testimony, as summarized by Petitioner, indicates that the DHO found the requested evidence to be irrelevant to the charges. In certain cases, video of events occurring before prison staff's arrival on the scene can be critical to establishing a prisoner's asserted defense. *See Howard v. U.S. Bureau of Prisons,* 487 F.3d 808 (10th Cir. 2007) (remanding for district court to determine whether petitioner was prejudiced by the BOP's refusal to produce and review a videotape that petitioner asserted would refute charges against him.); *Amarame v. Graber,* 2011 WL 1627931, *5 (D. Ariz. Apr. 29, 2011) (remanding for consideration of video that was relevant to timeline where no explanation or penological justification was given for refusing to consider it).

Petitioner relies upon *Howard* where the issue involved whether the petitioner had chased another inmate with a weapon and thrown the weapon at that inmate or whether he had, as he claimed, picked up the weapon and thrown it in a direction away from the other inmate, after the other inmate had attempted to attack him before dropping the weapon. *Id.* at 810, 815 n.5. Here, unlike *Howard,* regardless whether inmate B. attacked Petitioner before Lt. Crittle arrived on the scene, it remains that Petitioner continued to engage in fighting after Lt. Crittle and the other responding officers arrived and despite Lt. Crittle's orders to cease. (*See* Reply at 14-16; *see also id.* at 30 (video

would "show Petitioner acting in self-defense")). Nothing in the regulations excuses fighting where the other inmate initiates the altercation. *See Foley,* 2016 WL 8731203, at *4. Consequently, even if refusal to allow the video or inmate B's testimony could constitute a due process violation in this case, Petitioner has failed to establish any resulting prejudice.

Petitioner does not specifically argue that the DHO's decision was deficient under *Hill.* (*See* Reply at 35). As with Ground Five, because no DHO report has been located, it is not entirely clear what evidence was actually considered by the DHO other than Petitioner's statement at the DHO hearing that: "'I[]didn't hit him.'" (Answer, Exh. A, Att. 12 at 7) (all capitalization omitted). However, unlike Ground Five, Petitioner's own statements reflect that he told the DHO that the other inmate "had attacked me for no reason. . ." and Petitioner raised self-defense. (Petitioner's Aff. at ¶45). According to Petitioner, the DHO told him that even if his version of the event was confirmed, it would not make a difference "because a prisoner is not allowed to defend himself in the BOP . . . ." (*Id.* at ¶46). Petitioner also avows to this Court that upon being attacked, he "proceeded to defend [himself] from this vicious and unprovoked attack[.]" (*Id.* at ¶44) On the instant record, Petitioner's own argument and statements to the DHO constitute some evidence to support the finding that that Petitioner engaged in fighting. Consequently, Petitioner's Ground Six is denied as without merit.

### 7.    **Ground Seven**

Ground 7 involves two incident reports and two DHO hearings, each resulting in the loss of 27 days of GCT. The factual basis for the charges at issue is related. (*See* Answer at 17-20). One charge was for assault on May 3, 2013 at USP Atwater. (*See* Answer, Exh. A, Att. 14, 1, 5). The other charge was for taking hostages, but the DHO ultimately found Petitioner committed interfering with a security device, a violation of Code 208[20]. (Answer, Exh. A, Att. 15 at 1-4). Petitioner claims his due process rights

---

[20] Code 208 prohibits "[p]ossession of any unauthorized locking device, or lock pick, or tampering with or blocking any lock device (includes keys), or destroying, altering, interfering with, improperly using, or damaging any security device, mechanism,

were violated because the DHO refused to view the unit video and Petitioner was not permitted to be present when the inmate he was accused of assaulting testified. (Amended Petition at 19). Petitioner claims that the video would show that "he in no way impeded the operation of the security device." (*Id.*). Petitioner also asserts that the inmate who the DHO questioned outside Petitioner's presence had "volunteered to testify on behalf of Petitioner and confirm that he had been assaulted by a prison guard, not Petitioner[]", (*Id.*), and after testifying confirmed to Petitioner that he had "given truthful testimony consistent with . . ." Petitioner's version of the incident. (Petitioner's Aff. at ¶63).

According to Petitioner, the instant charges arose from an incident where Petitioner, who was in handcuffs, was placed in a cell with two other inmates who also were also handcuffed. (*Id.* at ¶¶51, 54). When prison staff directed the inmates to "come to the [food] tray slot for the purpose of being released from the handcuffs", Petitioner "stepped in front of the tray slot" to prevent uncuffing. (*Id.* at ¶¶54, 55). Petitioner claims he did so because he feared for his safety from the other two inmates who had informed the guards that if Petitioner was placed in their cell they would cause him bodily harm and they had shoved at him to try to prevent his entry into the cell. (*Id.* at ¶¶48, 50).

With regard to the charge of taking hostages, Senior Officer J. Ontiveroz completed an incident report indicating that he placed Petitioner in a cell with other inmates, including inmate P. (Answer, Exh. A, Att. 15 at 4). When Officer Ontiveroz ordered Petitioner

> to stand in the back of the cell so I could remove the hand restraints from both inmates. Inmate Reid refused to move away from the food slot. Inmate [P] tried to make his way to the food slot at which time inmate Reid bock [sic] the food slot with his body restricting inmate P[] attempted [sic] to be unrestrained. I again ordered inmate Reid to move away from the food slot at which time inmate Reid yelled "f[] the BOP, and "f[] you", and again refused to move away from the food slot.

or procedure." 28 C.F.R. § 451.3 (Table 1).

(*Id.*).

According to a memorandum by Lt. Mosley, Petitioner was placed in the cell with inmates R. and P., and Petitioner refused to allow inmates R. and P. to approach the door to have their restraints removed. (Answer, Exh. A, Att. 14 at 14). At some point, inmate R. was allowed to leave the cell, but when Petitioner tried to exit, staff shut the door and Petitioner "stated that he would not allow inmate P[] to exit the cell, and threatened inmate P[] with bodily harm. Inmate P[] reported to staff that inmate Reid bit him. A use of force team was assembled. . ." and Petitioner was ultimately removed from the cell with no use of force. (*Id.*; *see also id.* at 17). Soon thereafter, "medical entered the cell and assessed and treated inmate P.'s injuries (*Id.* at 16), which included an ecchymotic area on his left side and an abrasion with dried blood but "[n]o bite marks[]" or open wounds. (*Id.* at 9 (Health Services Clinical Encounter report); *see also Id.* at 14 (Lt. Mosley noted that the medical assessment showed Petitioner "has mild swelling in his right hand and upper right arm and has an abrasion on his right upper arm….Medical assessment of inmate P[] noted 4-5 cm abrasion on his left side with dried blood covering it.").

Petitioner's staff representative wrote a report to the DHO indicating that Petitioner requested him to: (1) confirm through the video that Petitioner was in the shower when staff reported he refused to take a cellmate, but the video was no longer available because videos are purged after two weeks "[u]nless it is a major incident . . . ."; and (2) to ask inmate P. whether P. had "made a threat toward inmate Reid, stating this is why [Petitioner] refused to allow P[] to approach the food slot to have his hand restraints removed….Information received from Inmate P[] and a staff witness (Officer Ontiveroz) indicates inmate P[] told Inmate Reid he was going to stab him." (Answer, Exh. A, Att. 15 at 7; *see also* Answer, Exh. A, Att. 14 at 1 (DHO report summarizing staff representative's statements)).

With regard to the assault charge, the DHO report reflects Petitioner's statements that "P[] and the other cellie said if they put me in there, there would be trouble. I didn't

know why.  They pushed me in the cell.  I didn't bite him, or threaten, or assault him.  I think it was from the officer shoving me in there."  (Answer, Exh. A, Att. 14 at 4).  The DHO report also reflects that inmate P[] who was called as a witness and stated:  "[T]hey took the third inmate out of the cell and he (Reid) didn't want to come into the cell."  (Answer, Exh. A, Att. 14 at 1).  In finding that Petitioner committed the charge of assaulting any person, the DHO relied upon:

> [T]he statement from the reporting officer that observed you in the described altercation, responding staff memorandums, injury assessments to corroborate the prohibited act.  You deny knowing why the other inmates did not want you in the cell, though your witness states you did not want to come into the cell.  You also claim you did not bit [sic] him, however, injury assessments reveal an abrasion to the left side.  You failed to provide exculpatory evidence in your defense and the DHO finds that you were culpable of the prohibited act.  Therefore, the DHO finds the greater weight in the evidence provided to support the prohibited act.

(*Id.* at 3).

With regard to the finding that Petitioner interfered with a security device, the DHO report reflects that inmate P., whom Petitioner requested as a witness, "stated he denies threating [sic] him, I didn't say don't come in the cell, he threatened me."  (Answer, Exh. A, Att. 15 at 1).  In finding Petitioner interfered with a security device, the DHO relied upon:

> the statement from the reporting officer's observation that you prevented the other inmates in the cell from coming to the food trap to be released from their hand restraints against their will.  You stated in your defense that you feared what the other inmates would do if un-cuffed.  You [sic] requested witness stated he did not threaten you, that you threatened him.  You failed to provide exculpatory evidence in your defense to refute the charges against you.  Therefore, the DHO finds the greater weight of the evidence in the staff members [sic] observation and that you prevented the other inmates from being taken out of restraints.  Therefore, the greater weight of the evidence is found in the officers [sic] account of the incident than you denial of the charge.

(*Id.* at 2).

As to lack of video review, Petitioner has not shown any prejudice with regard to the assault claim.  Petitioner apparently requested video review only to show that he had

been in the shower, and not in his cell, when staff reported he refused to take a cellmate. (Answer, Exh. A, Att. 15 at 7). Petitioner advances no argument that the video would have served to refute the assault charge. Instead, Petitioner claims before this Court only that the video would show that he did not "impede[] the operation of the security device." (Amended Petition at 19). However, Petitioner's statements in the affidavit belie such a claim given his admission that he "stepped in front of the tray to prevent [the other inmates] from being uncuffed . . . ." (Petitioner's Aff. at ¶55). Petitioner also made a similar statement to the DHO: "I got on the trap to prevent them from un-cuffing us because of the threats the two other inmates made. I refused to un-cuff because of fear of what the other inmates were going to do." (Answer, Exh. A, Att. 15 at 1). Any possible due process violation related to purging of the video was harmless.

In accord with *Wolff*, Petitioner was permitted to designate inmate P. as a witness. However, Petitioner argues that his due process rights were violated because he was not permitted to be present when inmate P testified. The Supreme Court has concluded that due process does not require a prison to allow an inmate to confront and cross-examine witnesses. *See Baxter*, 425 U.S. at 322-23; *see also Wolff*, 418 U.S. at 568 ("[I]t does not appear that confrontation and cross-examination are generally required in this context. We think that the Constitution should not be read to impose the procedure at the present time and that adequate bases for decision in prison disciplinary cases can be arrived at without cross-examination.").

Even when an inmate requests a witness who is expected to provide evidence in his defense, the method in which the inmate may question the witness is best left "to the sound discretion of the [prison] officials", *Wolff*, 418 U.S. at 569, and this case provides support as to why that is so. Petitioner believed that inmate P was going to testify favorably to him, however, the record reflects that was not the case. Instead, inmate P. arguably was an adverse witness, despite his statements to Petitioner to the contrary. In such a case, "the inmate accuser, who might freely tell his story privately to prison officials, may refuse to testify or admit any knowledge of the situation in question.

Although the dangers posed by cross-examination of known inmate accusers, or guards, may be less, the resentment which may persist after confrontation may still be substantial." *Id.* at 568.

The record reflects that Petitioner was permitted to ask questions of inmate P prior to the hearing through his staff representative and inmate P.'s response was reported to the DHO. The record also reflects that inmate P. was also able to make statements directly to the DHO which were recorded in each of the DHO reports. On the instant record, Petitioner's right to call inmate P. as a witness was honored while balancing against risks inherent in the prison setting and, thus, no due process violation occurred.

The Court further concludes that the evidence presented at Petitioner's disciplinary hearing and relied upon by the DHO was sufficient to meet due process requirements. In reviewing the decisions of the DHO, it is not for this Court to conclusively determine whether the inmate is innocent or guilty. Rather, it is the role of this Court to ensure that the disciplinary decision is not without evidentiary support or otherwise arbitrary. *See Hill*, 472 U.S. at 457. In this case, the DHO considered the written statements from the officers involved, statements from inmate P. and Petitioner, and medical records which supported an altercation occurred between P. and Petitioner. Further, with regard to the interference charge, the DHO was also aware of Petitioner's admission that he "got on the trap to prevent them from un-cuffing us . . . ." (Answer, Exh. A, Att. 15 at 1). The DHO's decision was supported by some evidence. Ground 7 is denied as without merit.

**8.    Ground Eight**

Petitioner challenges the loss of 27 days of GCT as a sanction for assault on Officer Cisneros without serious injury on January 10, 2013 at USP Atwater. (*See* Amended Petition at 20-22; Answer, Exh. A, Att. 16 at 1-3). The incident report, which was apparently written by Officer Cisneros although his name is illegible, reflects that at the time of the incident, Petitioner "began to flood the lower handicap shower in Unit 1B. As I began to clean the water from the unit floor, inmate Reid threw a clear unknown liquid substance from a cup at me. The liquid hit me in the upper left shoulder and facial

area. Inmate Reid then proceeded to pull his pants down and state, "I got some more shit for you mother-f[]." At that time, I cleared the area and notified Operations Lieutenant." (Answer, Exh. A, Att. 16 at 12). The record also reflects Officer Almanza's statement that he observed Petitioner "throw a clear substance from a cup towards Officer J. Cisneros and hit him. He then began to pull his pants down and appeared to try to urinate in the cup. He then stated, 'I got some more shit for you motherf[].'" (*Id.* at 29). Senior Officer Specialist, K. Ray and Officer I. Muro also submitted memoranda, stating they observed the incident and providing descriptions essentially identical to Officer Almanza's. (*Id.* at 30-31).

During the investigation, Petitioner stated, "'Staff splash water on me first.'" (*Id.* 13). Before the UDC, Petitioner requested "video review, but no staff rep" and stated: "'I had water splashed on me, so I threw water back.'" (*Id.* at 12).

The Amended[21] DHO report reflects states that "[y]our UDC Counselor Daniel [sic] reviewed the video surveillance as part of his fact finding, and presented the following: B. Daniels, stated the area was flooded by the shower and the officer was cleaning up, the camera does not show inside the cell." (*Id.* at 2).

At the DHO hearing, Petitioner stated that he was "'not guilty.'" (*Id.*). In finding Petitioner assaulted Officer Cisneros, the DHO relied upon:

> the statement from the reporting officer that observed you throw a liquid substance at him and strike him. Responding staff memorandums [sic] verify that they also saw you throw a liquid substance on the officer. Photographs taken at the time of the incident corroborate the prohibited act. You accept [sic] responsibility for throwing the water on the officer to the investigating Lieutenant and UDC, and deny the charges to the DHO, however, provided no exculpatory evidence to refute the charges against you. Your unit team reviewed the video and found no exculpatory evidence in your defense to refute the charges against you. Therefore, the DHO finds the greater weight of the evidence in the reporting officer's observation and your admission to throwing the substance on the officer. Therefore, you did commit the prohibited act.

---

[21] As discussed, *supra,* when addressing exhaustion of administrative remedies, the DHO issued an amended report with regard to this incident.

(*Id.* at 2-3).

Petitioner states in his affidavit that he did not tell the investigating officer or UDC that he "splashed water on prison guard Cisneros in retaliation for him splashing water on me, or for any other reason. What I told these individuals is that the prison guard was splashing water into the cell where I was then standing, and that I bailed the water back out." (Petitioner's Aff. at ¶81). Petitioner argues that the DHO's refusal to personally watch the video violated his due process rights because the video would have "support[ed] his contention that he had not thrown water on the prison guard while he was cleaning up water in the common area of the unit, or ignored dispositive exculpatory summation of the footage stating, in essence, that the reporting officer was not observed being splashed while he cleaned up water from the common area." (Reply at 30-31; *see also id*. at 37 (arguing insufficiency of the evidence because the summary of the video did not state that Daniels "observed anything being thrown on prison guard Cisneros, or him responding in a manner that would indicate such was the case….This summation should have dispositively proved Petitioner did not throw anything on him, notwithstanding the UDC's gratuitous statement that the camera does not show inside the cell (as Cisneros did not claim he was assaulted in the cell).").

In a different circumstance it might be arguable that lack of a more detailed description of the video review or more thorough consideration of the video evidence by the DHO could support finding a due process violation and resulting harm. Here, however, that is not the case given that the video was reviewed and given Petitioner's affidavit statement that he admitted to the UDC that he did in fact bail "water back out" of "the cell where I was then standing[.]" (Petitioner's Aff. at ¶81). Even though the summary did not indicate water was being bailed out of the cell where Petitioner was located,[22] and thus potentially hitting Officer Cisneros, Petitioner's affidavit statement as well as his statements to the investigating officer and UDC support just that conclusion.

---

[22] The summary did reflect that the video did not show inside the cell where Petitioner was located and, thus, the video would not have shown Petitioner's actions.

Additionally, this is not a case where the video was not preserved or discussed. It reportedly showed nothing conclusive one way or the other. Regardless, Petitioner's statements suffice to show that lack of any further review of the video was harmless.

The record also reflects "some evidence" supporting the DHO's finding. In addition to Petitioner's initial statements, the DHO also relied upon the report of Officer Cisneros, who was directly involved in the incident, along with the reports of the other officers who observed the incident. Consequently, Ground Eight is denied as without merit.

### 9. Ground Nine

Petitioner challenges the loss of 27 days of GCT as a sanction for tampering/blocking any locking device, here a food tray/box trap, in June 2014 at USP Tucson. (*See* Amended Petition at 22-24; Answer, Exh. A, Att. 19 at 1-3). Petitioner asserts that he did not commit the act and that the box was, instead, malfunctioning. (Amended Petition at 22). He claims his due process rights were violated because the video was not preserved and because his requested witness, Lt. Turner, did not testify before the DHO. (*Id.* at 23-24). The incident report, written by Officer A. Gallion, reflects that while conducting "irregular round[s]", he observed

> the entire window of [Petitioner's cell] door was covered with ripped up materials and altered clothing preventing me from seeing into the cell for a health and welfare check. At that point, I attempted to open the box trap and when I opened the back trap to see if I could see the inmate he attempted to throw a tray he had in the cell at the door and then placed it under the flap preventing me to [sic] secure the back of the trap. At that point I secured the front of the food trap and notified the Operations Lieutenant of the incident.

(Answer, Exh. A. Att. 19 at 4). Petitioner was originally charged with refusing to obey an order by any staff member, tampering with or blocking any lock device, and possession of anything unauthorized. (*Id.*). Petitioner stated to the UDC that he did not throw any trays and the box was malfunctioning. (*Id.*). He requested that the video be reviewed. (*Id.*).

The DHO dismissed the charge of failing to obey a direct order because he found

that the charge was not supported by the incident report.[23]  (Answer, Exh. A, Att. 19 at 2).  The DHO report also reflects that although Petitioner requested Lt. Turner as a witness, Lt. Turner's presence was not required based upon the Lieutenant's statement to the DHO that he "'could not recall the incident.'"  (*Id.* at 1).  The DHO report reflects that the DHO relied upon Officer Gallion's account of the incident in addition to Petitioner's admission to guilt during the DHO hearing.  (*Id.*).  In pertinent part, the DHO stated:

> Therefore, based on your own admission of guilt and the staff eyewitness account of the incident, it is the finding of the DHO that some facts do exist which sufficiently proves you committed the prohibited act of Tampering/Blocking any Locking Device, Code 208, and sanctioned you accordingly.

(*Id.* at 2).

The video was not reviewed because it was unavailable "due to the passing of time."  (Answer, Exh. A, Att. 19 at 7).  Petitioner asserts that Officer Gallion ordered him to give the officer two food trays and

> because the inner iron slider on the food box had the propensity of sliding its lock while in the up position (the open position) resulting in it unexpectantly [sic] banging close (with sufficient force to severe one's digits), Petitioner placed the first tray directly under the slider to protected [sic] himself while completing the transaction he was wont to do.  Gallion, however, became incensed and irate with Petitioner – for he and Petitioner had been at odds – and reached in the box and repeatedly shoved the tray into the inner opening striking Petitioner in the side of the head.  Petitioner, in an attempt to forestall further assault against him, pushed the tray back into the box, whereupon Gallion slammed the slider down with such force the [sic] he jammed the tray in the box.  Upon realizing his predicament, Gallion then turned to his comrade and falsely informed him that Petitioner had thrown the tray at him (which would have been an almost impossible feat).

(Amended Petition at 22-23).

According to Petitioner, the video would have confirmed his "contention that Gallion assault [sic] him through the box and jammed it by continuously slamming it

---

[23] The DHO did not discuss the charge of "possession of anything unauthorized[.]" (*See* Answer, Exh. A, Att. 19 at 1-4).  That charge is not at issue in the instant Petition.

1  down, and that the box was dangerously damaged." (*Id.* at 23).  Petitioner also indicates

2  that Lt. Turner would have testified that following the incident, the "inner slider was

3  malfunctioning" and the box was eventually replaced with another. (*Id.*).

4      Petitioner's own statements confirm that he placed a tray under the slider,

5  although he claims he did so to block the box so that the it would not unexpectedly close

6  because the box had been malfunctioning.  (*Id.*).  Petitioner stated during the DHO

7  hearing that he "'put the tray in the slot to prevent the slider from falling on my hand.'"

8  (Answer, Exh. A, Att. 19 at 2).

9      Petitioner does not deny that the window to his cell was covered in such a way as

10  to prevent Officer Gallion from seeing inside.  Both Officer Gallion's and Petitioner's

11  versions are consistent in that Petitioner placed a tray in the box in such a way as to jam

12  or block the box.  Accordingly, it does not appear that any failure to preserve and review

13  the video resulted in harm to Petitioner.  Nor did failure to call Lt. Turner result in any

14  harm to Petitioner.  First, Lt. Turner's presence was unnecessary in light of his statement

15  to the DHO that he could not recall the incident.  Additionally, according to Petitioner,

16  Lt. Turner could have only testified that the box was malfunctioning on the day after the

17  incident.  By that time, the condition of the box may not have been the same as it was

18  during the earlier incident between Petitioner and Officer Gallion.  Therefore, Lt.

19  Turner's testimony would have been irrelevant and any potential violation is harmless.

20      Due process in the instant context does not require evidence that logically

21  precludes any conclusion but the one reached by the disciplinary board; instead, there

22  need be only some evidence to support the findings made at the disciplinary hearing. *See*

23  *Hill,* at 472 U.S. 456-57.  It is the role of the Court to ensure that the decision is not

24  without evidentiary support or otherwise arbitrary.  Here, Officer Gallion's report of the

25  / / / /
   / / / /
26  / / / /
   / / / /
27  / / / /
   / / / /
28  / / / /

incident constitutes some evidence in support of the DHO's finding. Consequently, Petitioner's Ground Nine is denied as without merit.

**V.    Conclusion**

For the forgoing reasons,

IT IS ORDERED that Petitioner's Amended Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2241 (Doc. 7 is GRANTED IN PART and DENIED IN PART in that Petitioner's Amended Petition is granted with regard to Ground Five and is denied as to all other grounds for relief.

IT IS FURTHER ORDERED that Respondent shall expunge the disciplinary ruling at issue in Ground Five regarding the September 22, 2011 Incident Report at USP Pollock, and restore 27 days of good time credit to Petitioner.

The Clerk of Court is DIRECTED to enter judgment accordingly and to close the file in this action.

Dated this 17th day of August, 2017.

_____
Bernardo P. Velasco
United States Magistrate Judge